UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

UNITED STATES OF AMERICA,                                CASE NO. 1:14-cr-118

       Plaintiff

   vs.                                                                      Judge Michael R. Barrett

MICHAEL WILLIAMS,

       Defendant.

## <u>OPINION AND ORDER</u>

This matter is before the Court following a hearing upon Defendant's Motion to Suppress Evidence (Doc. 46) and the Government's response thereto (Doc. 49). Defendant moves to suppress all evidence obtained from the initial searches of 119 Retreat St., Bellevue, KY (herein "Retreat"), 403 Elberon Ave., Cincinnati, OH (herein "Elberon"), and 239 McCormick Place, Cincinnati, OH (herein "McCormick"). Defendant argues that the searches conducted were in violation of the Fourth Amendment of the United States Constitution.

## **FACTS**

On October 15, 2013, Police Officer Matthew Waters and Sergeant Batsch were given information by a confidential informant regarding heroin distributers in the Greater Cincinnati Region. (Doc. 49-3). The confidential informant notified officers that "Big Man," later found to be Michael Williams, was a wholesale heroin trafficker who distributes to street level traffickers around Greater Cincinnati. "Big Man" had a co-conspirator, "Gilly", later found to be Christopher Gulley, who has had several previous felony convictions for drug possession and trafficking.  Officer Waters was also able to identify a man in a car with Gulley when stopped by police as Reginald Williams, who also had felony drug trafficking convictions. (Doc. 49-3). On

1

October 28, 2013 the informant confirmed that R. Williams, known as "Dirtie," was a close associate of M. Williams and Gulley.

On October 30, 2013, M. Williams's Probation Officer, John Schwind, informed Batsch that M. Williams was unemployed and living off the generosity of his girlfriends. Schwind also told Batsch that one of M. Williams' girlfriends, Desha Reid, contacted Schwind a couple months prior to tell him that M. Williams was using 2008 Burnet Ave. to store and distribute drugs. (Doc. 49-3). Officers installed a surveillance camera near 2008 Burnet Ave. on January 9, 2014. Footage revealed M. Williams coming and going in Enterprise rental vehicles.  On several occasions, M. Williams would depart the residence with duffle bags. Trash at 2008 Burnet was only taken out once right before pickup and immediately returned to the residence by M. Williams. (Doc. 49-3).

On January 30, 2014, Batsch obtained a search warrant for the installation and GPS tracking of a vehicle used by M. Williams and Gulley, a 2004 Pontiac Montana. The device was installed the next day and the monitoring continued until March 14, 2014, at which time a search warrant extension was granted.  Officers also obtained a Hamilton County Grand Jury Subpoena for Duke Energy records for M. Williams, R. Williams, and Gulley as well as for 2008 Burnet Ave., 403 Elberon Ave., and 1743 Gellenbeck St. M. Williams and R. Williams did not have Duke accounts; however, Gulley was the account holder for Elberon. (Doc. 49-3).

On February 27, 2014, Officer Waters and members of the Cincinnati Narcotics Unit conducted surveillance around the Hamilton County Courthouse because M. Williams was scheduled for a probation hearing. After M. Williams left the courthouse, he walked to a parking lot and got in the driver's seat of a Cadillac Deville. (Docs. 49-2, 49-3). Officers followed M. Williams to Bellevue, KY. After driving through side streets, M. Williams pulled up to Retreat.

Minutes later, Gulley pulled up in a silver Ford F-150 Enterprise rental car and entered into Retreat. (Docs. 49-2, 49-3). M. Williams and Gulley soon exited Retreat and got into the F-150 with M. Williams as the driver. (Docs. 49-2, 49-3). From late February to March, officers surveyed Retreat and frequently observed vehicles operated by M. Williams' associates parked in front of the residence. (Doc. 49-2).

On March 3, 2014, the GPS tracker data on the Pontiac Montana revealed that the vehicle spent 30 minutes at Target World. Upon further investigation, officers found that Gulley and his girlfriend, Trenee Colvin, had just left the store after Gulley asked about buying pistols, paid to rent a Glock 9mm pistol and fired the Glock 9mm pistol. (Doc. 49-3).

On April 4, 2014, a Hamilton County Grand Jury Subpoena to Enterprise Car Rental revealed that the Chrysler Town and Country M. Williams drove to his residences and to the Casino was rented by R. Williams. (Doc. 49-3). On April 8, 2014, M. Williams and his girlfriend, Shenishafontia Watkins, drove the Pontiac Montana. Officers followed the vehicle from Sharonville to 119 Retreat St. After a short stop in the residence, M. Williams and Watkins drove from Retreat to Elberon. Officers observed Gulley, Colvin, M. Williams, Watkins, the Chrysler Town and Country rental, a Honda Accord, the Pontiac Montana and a U-Haul at 403 Elberon Ave. (Docs. 49-2, 49-3)

In late April, the Pontiac Montana made several trips around McCormick.  Surveillance of the area resulted in an observation of an associate of M. Williams and Gulley driving the Pontiac and entering McCormick. (Doc. 49-3).

On April 21, 2014, Sergeant Batsch and officers from the Northern Kentucky Drug Strike Force conducted a trash pull at Retreat from a can directly outside of the residence, a can that was seen in the yard of Retreat earlier in the day.  Several white trash bags were recovered and

brought to a secure location to examine their contents.  Batsch recovered a plastic baggie containing several plastic baggies with heroin residue and a pill bottle for dog medication with M. Williams' name and grandmother's address. Another trash pull at Retreat was conducted on May 5, 2014 and a cut up debit card with M. Williams' name on it was recovered. (Doc. 49-2). That same day, a trash pull was conducted at Elberon. The Elberon trash pull resulted in the discovery of several sandwich baggies with heroin residue, Target World liability waiver cards for Gulley and Colvin, among other items. (Doc. 49-3). Surveillance of Elberon throughout May and June caused officers to believe that Gulley resided at that address. (Doc. 49-3).

On May 12, 2014, officers installed a surveillance camera in front of McCormick. Camera footage revealed that M. Williams and Gulley both had keys to open the front door of the residence. The length, frequency and number of visits to the residence were identical to that of 2008 Burnet Ave. Also, no one appeared to stay overnight at the residence. (Doc. 49-1). This led officers to believe that McCormick was the new stash house for M. Williams. (Doc. 49-3).

Another trash pull was conducted at both Elberon and Retreat on June 9, 2014. On Elberon, Sergeant Batsch found receipts and paperwork in the name of Colvin as well as sandwich baggies containing heroin residue. (Doc. 49-3). The pull on Retreat by Officer Waters uncovered more baggies with heroin residue. (Docs. 49-2, 49-3).

As a result of these ongoing investigations, Officer Waters obtained and executed search warrants for Elberon and Retreat at approximately 7:00 a.m. on June 11, 2014. (Docs. 46, 49, 49-1). On Retreat, officers found M. Williams and Watkins asleep in bed. The search revealed several $1,000 dollar bundles in a bag in the corner of the kitchen cabinet, a sandwich bag containing what appeared to be heroin in the dishwasher on the porch, and a handgun, several sets of keys and numerous baggies with heroin residue in the bedroom. Officers spoke with

Watkins who said that she and Michael lived together on Retreat St.  Watkins also stated that she and Michael visited McCormick together a couple times. (Doc. 49-1).  On Elberon, officers found Gulley and Colvin and her two kids.  The search of the residence uncovered $10,000 dollars, a kilogram press, two handguns and several sets of keys. (Doc. 49-1).

Major Drug Offenders Unit officers were conducting surveillance on McCormick while the search warrants were being executed at Retreat and Elberon. (Doc. 49-1). Keys found on Elberon were brought to McCormick for testing. (Docs. 46, 49, 49-1). Officers assumed that no one was in the house until informed by kids outside that the car parked in the neighbor's driveway belonged to occupants of McCormick. (Testimony of Off. Mitchell).  The keys from Elberon were brought to the door at McCormick to see if any of them would unlock the door. One key fit, unlocking the front door of the residence. (Doc 49-1; Testimony of Off. Mitchell). At this time the door was "ajar." (Testimony of Off. Mitchell). Officers heard footsteps upstairs and approximately 3 to 5 minutes later an alarm sounded. (Testimony of Off. Mitchell).  Fearing that the individual(s) inside learned about the warrants executed on either Retreat or Elberon and would destroy evidence, officers entered the home and conducted a protective sweep. (Doc. 49-1; Testimony of Off. Mitchell). During the sweep, officers radioed in information such as the presence of three large dogs and an alarm system in the home (Doc. 49-1; Testimony of Off. Mitchell). This information, known only upon entrance to the home, was used in the affidavit for the search warrant for McCormick. (Doc. 46).

Upon entering, officers found M. Williams' uncle, David Richardson, and his girlfriend, Angela Moore, "pretending" to be asleep in a second floor bedroom (Testimony of Off. Mitchell; Docs. 46, 49, 49-1).  Richardson told officers that the home belonged to M. Williams and handed the officers a house key that M. Williams gave him while he stayed at the residence. (Doc. 46;

5

Testimony of Off. Waters).  After checking the house to make sure no one else was there, they took Richardson and Moore outside, securing the residence while waiting for the search warrant from the judge. (Docs. 46, 49). Upon issuance of a search warrant, officers conducted a full search of 239 McCormick Place. (Testimony of Off. Mitchell).

## ANALYSIS

The Fourth Amendment of the United States Constitution reads as follows: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated and no warrants shall issue, but upon probable cause…" U.S. Const. amend IV. The defendant, Michael Williams, claims that his Fourth Amendment rights were violated by the government in the search warrants and initial searches of the premises associated with him. Prior to analyzing the validity of the search warrants, the initial entry of McCormick and the affidavit on which the McCormick search warrant relied, this Court must first determine whether the defendant has standing to contest warrants for the three residences.

### A. Standing

The burden of establishing standing lies upon the defendant, M. Williams. *Rakas v. Illinois*, 439 U.S. 128, 130 n. 1 (1978). In order to establish standing, the defendant must demonstrate a subjective expectation of privacy in the place that was searched or the items seized, and, society must recognize this subjective expectation of privacy as reasonable. *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1510 (6th Cir. 1988) (citing *California v. Ciraolo*, 476 U.S. 207, 211 (1986)).

  1.  *Defendant lacks standing to raise claims for 403 Elberon Ave.*

According to the Court in *Rakas*, a defendant aggrieved by an illegal search and seizure through the introduction of evidence resulting from the search of a third party's property may have a legally sufficient interest in a place other than his own residence to protect that place from illegal government intrusion. 439 U.S. at 134.  However, in viewing the evidence, although a key found at Elberon was used to unlock the door at McCormick, a place thought to be owned by Defendant, Defendant did not have a legitimate expectation of privacy in the Elberon residence. The house was occupied by Gulley and the Duke Energy bill was registered to him as well. Trash pulls revealed receipts documents belonging to either Gulley or his girlfriend.  Further, there has been no evidence that Defendant had a key to or resided in Elberon. The only connection that Defendant has to the home is that he has been seen visiting the house by officers conducting surveillance. Defendant does not have a legitimate privacy interest in the contents inside Elberon.

Defendant has not met his burden of establishing standing for Elberon because he has not shown that he has a subjective expectation of privacy of the residence that society would deem as reasonable. Therefore, Defendant does not have standing to contest the search warrant for 403 Elberon Ave.

> 2. *Defendant has standing for 119 Retreat St.*

It is clear from the record that Defendant was linked to Retreat and had a legitimate subjective expectation of privacy of the contents within the residence.  Although the record does not show that the house bills were paid by Defendant, he is the current occupant of the house. Police surveillance, trash pulls uncovering a cut up credit card and pill bottle in his name, and an admission from Defendant's girlfriend that he lived in the residence all demonstrate that Defendant has an interest in the house and the contents within.

The *Ciraolo* test has been met: Defendant has a subjective expectation of privacy of the contents in his home and society views that expectation as reasonable.  Therefore, the Defendant has met his burden of establishing standing to contest the search warrant for 119 Retreat St.

### 3. *Defendant has standing for 239 McCormick Place.*

The evidence presented demonstrates that Defendant has a legitimate expectation of privacy for McCormick.  Although Defendant did not live in the house, surveillance revealed that he is one of two people to have a key to the front door.  Also, Defendant's uncle, David Richardson, informed officers that McCormick belonged to Defendant and that Defendant would occasionally let him stay at the residence.

The *Ciraolo* test has been met: Defendant has a subjective expectation of privacy of the contents in his home and society views that expectation as reasonable. Therefore, the Defendant has met his burden of establishing standing to contest the search warrant for 239 McCormick Place.

### B.  Search Warrant on 119 Retreat St.

Defendant argues that officers did not have probable cause to conduct a search of Retreat, therefore violating his Fourth Amendment right. To satisfy the reasonableness requirement set out in the Fourth Amendment, police generally need to establish probable cause and obtain a warrant prior to entering the home. *Payton v. New York*, 445 U.S. 573, 585-586 (1980). Probable cause is defined as "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United State v. Padro*, 52 F.3d 120, 122-23 (6th Cir. 1995) (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)).  When reviewing probable cause, the judge may only look within the affidavit itself. *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005). An affidavit for a warrant establishes probable cause when it contains facts

that indicate that there is a fair probability that the search of the proposed premises will uncover evidence of the crime. *Id.* The neutral and detached magistrate must make a decision as to whether or not, given all the information in the affidavit, probable cause exists. *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  This determination of probable cause by the magistrate is to be given great deference. *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000).  To suppress a search warrant, the Court must find that probable cause is so obviously lacking in the affidavit that neither the warrant nor the officer's belief in the warrant are reasonable. *Frazier*, 423 F.3d at 526.

Defendant argued that he was never seen making any transactions. Although the affidavit for the search warrant for Retreat relied on surveillance that never revealed Defendant conducting any business transactions, there was ample information that would lead a reasonable person to believe evidence was likely to be found at this address. Surveillance revealed several rental vehicles going to and from the residence and linked 119 Retreat St. to another suspected drug house, 403 Elberon Ave.  Further, officers collected trash pulls at 119 Retreat St. on three different occasions.  The first trash pull in April 2014, revealed plastic baggies with heroine residue as well as a pill bottle with Defendant's name on it.  In May 2014, officers found a cut up debit card with Defendant's name.  Finally, during their third trash pull at 119 Retreat St. in June 2014, officers recovered several torn baggies which presumptively tested positive for heroin residue at the Hamilton County Coroner's Crime Lab.

In viewing the evidence as a whole, probable cause existed under *Gates*. Probable cause for the search warrant, under *Frazier*, was not so lacking that the magistrates issuance of the warrant and the officer's belief in the warrant's validity were unreasonable. Therefore, the search of Retreat following the June 11, 2014 warrant was not a violation of the Fourth Amendment.

9

Accordingly, the Court DENIES Defendant's Motion to Suppress evidence recovered from 119 Retreat St.

### C.  Initial Entry on 239 McCormick Place

The Fourth Amendment protects individuals from unreasonable searches and seizures. However, the chief evil that the Fourth Amendment protects individuals from is the "physical entry of the home." *Payton v. New York*, 445 U.S. 573, 585 (1980). To ensure that people are protected in their homes, police generally need a search warrant issued by a neutral magistrate based on sufficient probable cause prior to entry. *Id.* at 585-586.

The analysis of the initial warrantless entry of McCormick consists of two parts: 1) whether the insertion of the key in the front door was a search and 2) whether exigent circumstances existed allowing officers to bypass the Fourth Amendment warrant requirement.

#### 1.  *Insertion of Key*

According to the Court in *United States v. Salgado*, insertion of a key into the accused's apartment door was not a search. 250 F.3d 438, 456-57 (6th Cir. 2001). However, in *Salgado*, officers accessed the door through an unlocked common hallway, a place where the accused had no reasonable expectation of privacy. The officer did not open the door nor enter the apartment. The only information gained was that the key unlocked the door. *Id*.

In the present case, officers tested a key found upon execution of a search warrant at Elberon to see if it would open the door to McCormick.  Unlike *Salgado*, officers were not in an open hallway in an apartment complex, rather they were on the front porch of a home. The Court in *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013), stated that curtilage, the area immediately linked to the home where home life extends, is considered to be part of the home for Fourth Amendment purposes.  As porches are considered curtilage, an individual's expectation of

privacy on a porch is considered heightened to the point of a home. *Jardines*, 133 S. Ct. at 1414-15 (recognizing the front porch as part of the curtilage, and stating "[t]he front port is the classic exemplar of an area adjacent to the home and 'to which the activity of home life extends'"). *Jardines* goes on to hold that although there is a privacy interest in the porch, it is recognized that any private citizen may walk up to a front door of a home and knock and wait for an answer. In light of this, officers without a warrant may walk up to the door and knock because it is no more than a private citizen would do. *Id.* at 1415-16.

According to testimony from Officer Mitchell, police went up to the door, tried the key, and were there no more than 3 to 5 minutes before deciding to enter. Although, according to *Jardines*, porches are afforded the same privacy interest as inside homes, officers are allowed to walk up to the door like any normal citizen. Once on the porch, officers inserted the key and unlocked the front door. But unlike in *Salgado* where the officers did not open the door, Mitchell described the door as being ajar after it was unlocked, implying that the plane of the home was broken after the key was tested. Three to four minutes after the door became ajar, an alarm went off in the house. Mitchell went on to testify that something or someone other than the door must have set off the alarm because it was minutes after the door became ajar, however no evidence was offered in support of the officer's claim. The Court cannot conclude, based solely on his testimony, the door was not ajar enough to set off the alarm.

Even if the initial unlocking of the door simply to see if the key worked was acceptable, since the chief evil the Fourth Amendment protects against is physical entry into the home, *Payton*, 445 U.S. at 585, exigent circumstances must have been present for the door to become ajar and for the subsequent entry of the home.

    2.  *Exigent Circumstances*

11

An exception to the Fourth Amendment warrant requirement is the existence exigent circumstances. *Kentucky v. King*, 131 S. Ct. 1849 (2011).  Due to the sanctity of the home, exigent circumstances must be demonstrated by the government in order to overcome the presumption of unreasonableness that is attached to all warrantless home searches.  *Welsh v. Wisconsin*, 104 S. Ct. 2091, 2097 (1984). One instance giving rise to exigent circumstances is imminent destruction of evidence, *Georgia v. Randolph*, 547 U.S. 103, 116 (2006), and, in drug cases specifically, exigency may arise from the danger of destruction of evidence of drug crimes, *United States v. Elkins*, 300 F.3d 638, 655 (6th Cir. 2002) (citing *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1511 (6th Cir. 1988)). In order to demonstrate exigency, the government must demonstrate: "(1) a reasonable belief that other persons are inside the building; and (2) a reasonable belief that these persons are likely to destroy evidence of a crime." *Id.* at 656.

In analyzing whether or not exigent circumstances existed at both the time the door became ajar and time of entry into the home, the Court must consider Officer Mitchell's testimony.  First and foremost, Officer Mitchell stated that police believed McCormick to be uninhabited.  This belief was supported in the affidavit for the search warrant for McCormick. This fact alone calls into question whether or not officers had a reasonable belief that someone was in the building at the time the door became ajar and/or time of entry into the residence.

Officer Mitchell proceeded to provide the Court with three renditions of the occurrences of the day. However, in each rendition was the presence of an alarm. Testimony of the door being ajar calls into question whether the door or someone inside caused the alarm to sound.  If the door caused the alarm to sound, this would be a police-created exigency.  When police create

12

exigency by engaging in conduct that violates or threatens to violate the Fourth Amendment, warrantless entry is unreasonable. *King*, 131 S. Ct. at 1858.

On the other hand, the alarm could have gone off because someone inside set it off. However, neither the Government or the defense, nor the affidavit for a search warrant mentions an alarm going off prior to entry of the home. The Government states that officers entered because they heard voices inside the home and were afraid that they would have been alerted of the earlier searches that occurred that morning. The statement contradicts the affidavit which only says that officers were scared someone was inside and would find out about the earlier searches and destroy evidence. A few paragraphs earlier in the affidavit, Waters indicated that it appears no one spends the night at McCormick.

At or around 7:00 a.m. anyone able to alert people at McCormick of the searches had been detained and unable to contact outside persons. The Court in *United States v. Jorge Salgado* stated, "[a] mere possibility that evidence will be destroyed -- a possibility that exists any time a drug dealer is arrested out of his home or other place of (illicit) business -- is not enough to support search of person's home without a warrant." 807 F.2d 603, 609 (7th Cir. 1986). All that existed in this case was a mere suspicion. Even if there was a reasonable expectation that someone was in the residence, the fear of destruction of evidence is not reasonable enough to supplant an individual's heightened privacy interest in the contents of his home.

Furthermore, as Defendant correctly argues, officers were at McCormick at the time of the searches of Retreat and Elberon. Instead of entering McCormick due to exigency or applying for a warrant simultaneously with the execution of the two other warrants, officers waited to act until the keys were brought from Elberon. These actions do not suggest exigent circumstances or

13

reasonable belief that anyone was in the house that could destroy evidence until a key was brought and tested in the front door.

Therefore, there is not sufficient evidence to satisfy the *Elkins* two-prong test.  Officers were operating under the assumption that no one occupied the home. Even if officers knew that the home was occupied, anyone that could have alerted occupants of McCormick of searches at Retreat and Elberon had been detained and unable to make outside contact.  Officers did not have a reasonable belief that people were inside the building nor a reasonable belief that these persons were likely to destroy evidence.

3.  *Conclusion*

While insertion of the key into the lock alone did not constitute a search, exigent circumstances did not exist for officers to bypass an individual's heightened Fourth Amendment interest in their home to justify either the door being ajar or the subsequent entry into the home. Therefore, any evidence gathered as a result of the initial entry of 239 McCormick Place is hereby suppressed.

Accordingly, the Court GRANTS Defendant's Motion to Suppress evidence recovered from the initial entry of 239 McCormick Place.

**D.  Officer Affidavit on which the McCormick Search Warrant Relied**

To suppress a search warrant, the Court must find that probable cause is so obviously lacking in the affidavit that neither the warrant nor the officer's belief in the warrant are reasonable. *United States v. Frazier*, 423 F.3d 526 (6th Cir. 2005).  In the case at hand, the Court must analyze evidence gathered during a protective sweep later used in an affidavit for a search warrant to determine the validity of the warrant.

14

If there is a reasonable fear that individuals inside the area pose a danger to officers or others and this fear can be articulated and supported by facts, officers may bypass the Fourth Amendment and conduct a protective sweep. *United States v. Taylor*, 248 F.3d 506, 513 (6th Cir. 2001).  A protective sweep is for the protection of the officers or innocent citizens at the scene, therefore must be limited to a superficial search of the premises for the individuals believed to pose a threat. *Id.* at 513-14.  Upon entry of the home, officers conducted a protective sweep. A superficial search was made, however, officers radioed in information from the sweep to use in the affidavit for the search warrant.

The court in *Taylor* specifically noted that before the protective sweep was made, officers had probable cause to obtain a search warrant of the area.  The same is not true for the present case. Instead of applying for a warrant simultaneously with the execution of the two other warrants, officers waited to act until the keys were brought to McCormick from Elberon. Officers needed the key for the affidavit for a search warrant because it created a connection between Elberon and McCormick.

Further, the Government erroneously states that "[n]othing from the securing of 239 McCormick was used as probable cause in the search affidavit." However, the final paragraph of the affidavit contained information about the house that officers radioed in about having an alarm system and three large dogs in the basement. This information obtained regarding the presence of both an alarm and large dogs was used as indicia that drugs would be found on McCormick. The affidavit also used information about Defendant from David Richardson, a man secured in the house during the protective sweep. Statements made by Richardson were used to connect Defendant to the McCormick residence. As evidenced by the contents of the affidavit, the officers here were gathering evidence for a search warrant. This goes beyond the parameters of a

protective sweep and was the consequence of an illegal entry into the home due to lack of exigency.

In *United States v. Allard*, 600 F.2d 1301, 1304 (9th Cir. 1979), an officer's observations following an illegal warrantless entry into a hotel room were a substantial factor in the decision to seek a search warrant. The circuit court explained that evidence gathered in a warrant-authorized search would be tainted by the initial illegal entry. *Id.* at 1306.  In the present case, the initial entry and search of 239 McCormick Place tainted the affidavit for the search warrant. The Court sees no logical reason law enforcement would not have attempted to secure a warrant at the time as the others had sufficient probable cause existed before the insertion of the key and entry into the home. Officers lacked probable cause without the key to obtain a search warrant. The search warrant was dependent on the information obtained from the illegal entry and placed in the affidavit. In viewing the affidavit without the information from the warrantless initial entry there lacked sufficient probable cause to justify an issuance of a search warrant.  Therefore, any and all evidence seized as a result of the search warrant is hereby suppressed.

Accordingly, the Court GRANTS Defendant's Motion to Suppress evidence recovered from the warrant-authorized search of 239 McCormick Place.

**CONCLUSION**

Accordingly, Defendant's Motion to Suppress (Doc. 46) is DENIED in part and GRANTED in part consistent with this Opinion and Order.

**IT IS SO ORDERED.**

s/Michael R. Barrett

MICHAEL R. BARRETT, JUDGE
UNITED STATES DISTRICT COURT